UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) No. 06-CV-2648-JM(WVG) )  |
| Plaintiff, | ) REPORT AND RECOMMENDATION ) AFTER EVIDENTIARY HEARING |
| v. | ) ) |
| KENDELL LANG, *et al.*, | ) ) |
| Defendants. | ) ) |

In the final stage of this long-running case, the Court must determine the priority of claims to funds from the judicial sale of a foreclosed residential property. At the parties' request, and after Judge Miller's referral, I convened an evidentiary hearing on the sole issue whether National Property Trust's ("NPT") Deed of Trust ("Deed") is a valid and enforceable security interest on the auctioned home. The outcome of this issue will determine whether NPT's lien will be satisfied first and consume all of the available funds or whether NPT's lien will be set aside and the other claimants' liens satisfied. To invalidate NPT's interest, the United States of America ("USA") argues that the loan transaction from which the Deed arose violates California law and is void as a

06CV2648

1   result.   I recommend the finding that the USA did not meet its
2   burden to show that Kendell Lang and NPT devised a scheme to shield
3   the auctioned property, or the proceeds of its sale, from future
4   creditors.   As a result, I further recommend that NPT's Deed be
5   found a valid security interest.   I ultimately recommend that the
6   funds held in the Court's account first satisfy NPT's senior
7   interest, followed by satisfaction of the interests held by the USA,
8   Franchise Tax Board ("FTB"), and White Memorial Medical Center
9   ("White Memorial"), which I collectively refer to as the "Lien
10  Claimants."

11                          **I. <u>BACKGROUND</u>**

12        In 2006, the USA and FTB held multiple valid liens against
13  Lang's house ("the Lone Jack Road property") for years of unpaid
14  state and federal taxes.   In addition, White Memorial held a valid
15  lien for a judgment it won against Lang in California state court.
16  The USA initiated this action on December 4, 2006, to reduce to
17  judgment multiple tax assessments against Defendants Kendell Lang
18  and his now-deceased wife, Patricia Lang, and to foreclose on the
19  Lone Jack Road property.

20        On April 7, 2008, the USA filed a motion for summary
21  judgment. (Doc. No. 64.)  On July 25, 2008, the Court granted the
22  USA's motion, reduced the assessments to judgment, and foreclosed
23  the liens against the Lone Jack Road property. (Doc. No. 77.)  The
24  Court also entered an Order for Judicial Sale. (Doc. No. 78.)

25        On November 4, 2009, the Lone Jack Road property was sold at
26  auction, (Doc. No. 94), and the Court confirmed the sale on December
27  9, 2009, (Doc. No. 95).  After expenses were paid, the sale yielded
28  $780,599.73, which remains in the Court's registry. (Doc. No. 95.)

1   All parties, except NPT, agree on the priority of their liens and

2   resulting claims to this money.   The only disputed claim is NPT's

3   interest.[1]

4        On March 19, 2010, the USA filed a motion to reopen discovery

5   in light of newly discovered information, hoping that additional

6   discovery would assist the parties resolve the dispute over NPT's

7   claim.  (Doc. No. 96.)  After discovery resumed, Lang was deposed at

8   least one additional time.  Lang's second deposition testimony was

9   starkly different than his first testimony, which confirmed the

10  validity of the Note and Deed.  However, Lang changed his testimony

11  to reveal that the Note was actually part of a scheme to shield the

12  Lone Jack Road property from future creditors.  He further testified

13  that the supposed loan money was his own money, transferred to NPT

14  and back to him to give the appearance of a loan.

15       Once the additional discovery period closed, the parties

16  requested a settlement conference to attempt to resolve the NPT

17  claim issue.  (Doc. No. 132.)  In the end, the parties were unable

18  to resolve the dispute, and the Court set this matter for eviden-

19  tiary hearing at their request.  (Doc. No. 141.)

20       On August 18, 2011, all parties save NPT filed a "Stipulation

21  re Priority of Lien," by which they stipulated to the priority of

22  each others' claims and the amount of each claim as of June 7, 2011.

23  (Doc. No. 142.)  As of June 7, 2011, the aggregate of the Lien

24  Claimants' claims stood at $671,962.60.  (Id.)   NPT claims the

25

26

27  _____

28  [1] NPT's interest arises by operation of a purported loan agreement for $335,000, ("the Note"), which is secured by the Deed.  The Note was executed by NPT, with Dennis Cotto as the sole shareholder, and Cascade Professional Trust, with Lang as the trustee.

06CV2648

1    principal and interest on its Note amounts to $1,454,722.29.

2    (Hearing Transcript, Doc. No. 151 at 147:14-24.)[2/]

3                   **II.   RECOMMENDED CONCLUSIONS OF LAW**

4    **A.       California Contract Law Controls**

5           The United States avers, and the parties agree, that

6    California contract law governs interpretation of the Note, which at

7    its core is simply a contract.  California law provides two bases to

8    invalidate the Note.

9           First, as a matter of public policy, "[a]ll contracts which

10   have for their object, directly or indirectly, to exempt anyone from

11   responsibility for his own fraud, or willful injury to the person or

12   property of another, or violation of law, whether willful or

13   negligent, are against the policy of the law."  Cal. Civ. Code

14   § 1668.  Failure to pay federal taxes is a violation of law.  26

15   U.S.C. § 7203.  Therefore, if a contract is created to assist a

16   person to avoid his obligation to pay taxes, that contract is void

17   for violation of California public policy.

18          Second, California's Uniform Fraudulent Transfer Act

19   invalidates the Note and Deed if the Lien Claimants can show that

20   using Lang's house as security for the Note was intended to help

21   Lang avoid his obligations to creditors.  The Act provides:

22          A transfer made or obligation incurred by a debtor is
            fraudulent as to a creditor, whether the creditor's claim
23          arose before or after the transfer was made or the obliga-
            tion was incurred, if the debtor made the transfer or
24          incurred the obligation as follows:
            (1) With actual intent to hinder, delay, or defraud
25          any creditor of the debtor.
            (2) Without receiving a reasonably equivalent value
26          in exchange for the transfer or obligation, and the
            debtor either:

27

28   ───────────────────
     [2]  All page number references to documents on the Court's docket refer to the
     CM/ECF re-numbered pages, not the document's native pagination.

                                      4
                                                                    06CV2648

1
       (A) Was engaged or was about to engage in a
       business or a transaction for which the remaining
2
       assets of the debtor were unreasonably small in
       relation to the business or transaction.
3
       (B) Intended to incur, or believed or reasonably
       should have believed that he or she would incur,
4
       debts beyond his or her ability to pay as they
       became due.
5

Cal. Civ. Code § 3439.04(a).
6

**B.**    **Under California Law, the Lien Claimants Bear the Burden of**
7    **Proof**

8      The Lien Claimants bear the burden of proving that Cotto and

9 Lang created the Note and Deed with actual intent to shield Lang's

10 assets from future creditors.   See Annod Corp. v. Hamilton &

11 Samuels, 123 Cal. Rptr. 2d 924, 928 (Cal. Ct. App. 2002); Whitehouse

12 v. Six Corp., 48 Cal. Rptr. 2d 600, 604 (Cal. Ct. App. 1995). The

13 Lien Claimants and NPT agree.

14      The standard of proof for actual intent under Section 3439.04

15 is by a preponderance of the evidence.  In re Serrato, 214 B.R. 219,

16 229 (N.D. Cal. 1997) (citing cases); Liodas v. Sahadi, 562 P.2d 316,

17 324 (Cal. 1977). The Lien Claimants accordingly must persuade the

18 "trier of fact . . . . 'that the existence of a fact is more

19 probable than its nonexistence.'" Concrete Pipe & Prods. v. Constr.

20 Laborers Pension Trust, 508 U.S. 602, 622 (1993) (quoting In re

21 Winship, 397 U.S. 358, 371-72 (1970) (Harlan, J., concurring).

22 **C.**    **Statements Made Against the Declarant's Penal Interest Are**
       **Judged on a Case by Case Basis and in Context**
23

24      The concept of a statement against one's penal interest

25 appears in the law in several contexts and is applied in nuanced

26 ways based on the context.  Courts often deem such statements

27 reliable because they are either accompanied by surrounding indicia

28

06CV2648

1    of reliability or <u>directly</u> implicate the declarant in criminal

2    activity, which itself is an indicia of reliability.

3        For example, in the context of extradition hearings, the

4    Ninth Circuit has "held that the self-incriminating statements of

5    accomplices are sufficient to establish probable cause . . . ."

6    <u>Zanazanian v. United States</u>, 729 F.2d 624, 627 (9th Cir. 1984)

7    (<u>citing</u> <u>Curreri v. Vice</u>, 77 F.2d 130, 132 (9th Cir. 1935)).  The

8    accomplices's statement is considered reliable because the accom-

9    plice <u>directly</u> implicates himself in the crime while simultaneously

10   providing information against the person to be extradited.  <u>See,</u>

11   <u>e.g.</u>, <u>In re Extradition of Santos</u>, 2011 U.S. Dist. LEXIS 62672, *32-

12   *33 (C.D. Cal. June 13, 2011) ("Two witnesses, Rosas and Hurtado,

13   gave detailed statements inculpating themselves and Munoz in the

14   planning and execution of the kidnapping.  The properly authenti-

15   cated statements of Rosas and Hurtado are competent evidence and

16   contain indicia of reliability.")  The reliability of a statement in

17   this context is premised on the notion that "'people do not lightly

18   admit a crime and place critical evidence in the hands of the police

19   in the form of their own admissions.'"  <u>United States v. Dozier</u>, 844

20   F.2d 701, 707 (9th Cir. 1988) (<u>quoting</u> <u>United States v. Harris</u>, 403

21   U.S. 573, 583 (1971)).

22       In the context of search warrants based on informants'

23   statements, such statements alone are not necessarily automatically

24   deemed reliable without additional indicia of reliability.  <u>See,</u>

25   <u>e.g.</u>, <u>United States v. Myers</u>, 2006 U.S. Dist. LEXIS 25245, *7 (D.

26   Haw. Jan. 12, 2006) ("Because the informant made statements against

27   his or her penal interest, the informant had previously provided

28

06CV2648

1    reliable   information   in   police   investigations,   _and_   independent
2    investigation corroborated some of the informant's statements, the
3    court concludes that Judge Keller had a reasonable basis for deeming
4    the   informant's   statements   reliable.")   (emphasis   added);   United
5    States v. Scott, 2004 U.S. Dist. LEXIS 29753, *40-*41 (D. Nev. Jan.
6    23,   2004)   ("The   government   has   not   directed   this   court   to   a   case,
7    and   this   court   was   unable   to   find   a   case,   where   an   informant's
8    statements   against   penal   interest   _alone_--in   the   absence   of   any
9    reputation   for   reliability,   independent   verification,   or   personal
10   basis of knowledge--were sufficient to support a finding of probable
11   cause.")   (emphasis in original).   In this context, extrinsic indicia
12   of   reliability   are   required   to   substantiate   the   informant's
13   statement.

14        Finally,   in   the   context   of   admitting   an   otherwise   hearsay
15   statement under Federal Rule of Evidence 804, a statement against
16   penal   interest   must   be   "supported   by   corroborating   circumstances
17   that clearly indicate its trustworthiness" before it is admissible
18   as non-hearsay testimony.   Fed. R. Evid. 804(b)(3)(B).   Again, such
19   a statement is not _ipso facto_ reliable and requires more before it
20   is admissible.

21        The common theme in any of these contexts is that a statement
22   against penal interest is not deemed reliable on its face.   Indeed,
23   if circumstances surrounding the statement militate against the
24   statement's   reliability,   a   statement   is   not   deemed   reliable   or
25   admissible.   See, e.g., United States v. Beydler, 120 F.3d 985 (9th
26   Cir. 1997) (holding the district court abused its discretion when it
27   admitted a statement under Rule 804 when surrounding circumstances
28   vitiated   the   statement's   reliability).   Ultimately,   "[w]hether   a

1  statement is in fact against interest must be determined from the

2  circumstances of each case," <u>Williamson v. United States</u>, 512 U.S.

3  594, 601 (1994), and "can only be determined by viewing it in

4  context," <u>id.</u> at 603.

5        **III.   RECOMMENDED FINDINGS OF FACT**

6        The primary factual dispute here is the validity of the Note

7  and Deed.  The resolution of this issue will cleanly determine the

8  priority of all liens in this case.  The Lien Claimants heavily rely

9  on Lang's second deposition testimony, in which he contradicted his

10  first testimony and testified that he and Cotto drafted the Note

11  with the intent to thwart Lang's future creditors.  However, Cotto

12  maintains, as he has throughout this case, that the Note was a bona

13  fide loan secured by the Deed.   If Cotto's version of facts

14  prevails, NPT would be first in line for satisfaction of its lien,

15  and NPT's claim would entirely consume the available funds and leave

16  nothing for the Lien Claimants.  Ultimately, I recommend the finding

17  that the Lien Claimants failed to demonstrate that Cotto and Lang

18  executed the Note with the intent to defraud future creditors, and

19  thus both the Note and Deed are valid.  To do so, I will necessarily

20  evaluate the credibility of Lang and Cotto, who were the only

21  witnesses presented at the hearing and who presented two diametri-

22  cally opposed testimonies.  Of the two men, Cotto is more credible.

23  **A.**   **<u>Recommended Finding of Fact:  Lang's Changed Testimony Was</u>**

24  **<u>Not Credible on the Basis that It Was Against His Penal</u>**
   **<u>Interest</u>**

25        The USA strenuously argues that Lang's second deposition

26  testimony was credible because it contradicted his first deposition

27  testimony and was against his penal interest as a result.  The basis

28  for Lang's potential criminal liability is his indirect exposure to

1  a perjury prosecution as a result of this contradictory testimony--

2  not any affirmative admission to criminal conduct.  However, the

3  mere fact that a statement may indirectly expose one to prosecution

4  is not by itself dispositive when other surrounding circumstances

5  discredit the declarant's credibility.  Although it is abundantly

6  clear that Lang perjured himself during one of his depositions, the

7  question remains which version of "Lang's truth" is the <u>actual</u>

8  truth.  It is just as likely that Lang's testimony at his first

9  deposition was truthful and his testimony at the second deposition

10 was not.  Although the USA argues for the veracity of Lang's second

11 testimony, the surrounding circumstances strongly discredit Lang's

12 credibility, and I cannot recommend that his second testimony be

13 found reliable simply because it abstractly exposed him to a perjury

14 prosecution.

15       **1.**  **Background**

16     At his first deposition in 2007, Lang testified under oath

17 that the Note was a valid loan for $335,000 from NPT to Lang, and he

18 used the money to purchase the Lone Jack Road property.  Lang's

19 testimony substantially matched and corroborated Cotto's testimony,

20 as both men testified to the authenticity and validity of the Note

21 and Deed.  Then, at Lang's second deposition in mid-2010, he

22 dramatically changed his story.  He testified that the Note and Deed

23 were the result of a scheme to shield the Lone Jack Road property

24 from Lang's future creditors.

25     At the evidentiary hearing, Lang testified that the scheme to

26 avoid future creditors was originally Cotto's idea.  (Doc. No. 151

27 at 15:4-17.)  Cotto approached Lang and suggested forming a trust

28 for the purpose of "wealth preservation and protection" of Lang's

1   assets.  (Id. at ll. 7-8.)  Moreover, the "loan" itself was a sham,

2   as Lang transferred $335,000 of his own money to Cotto, who then

3   transferred the funds back to Lang as a "loan" for the purported

4   purchase of the Lone Jack Road property.  (Id. at 16:7-17.)  Lang

5   paid Cotto $70,000 for his role in the scheme.  (Id. at 15:20-22.)

6   Also around the time they executed the Note, Lang and Cotto

7   supposedly executed a reconveyance of the Lone Jack Road property

8   back to Lang to "wipe out the lien" at a later date.  (Id. at 21:14-

9   20.)  Lang wanted Cotto to sign the reconveyance in advance so

10  getting Cotto's signature would not become a problem in the future.

11  (Id. at 21:24-22:2.)

12              **2.  Lang's Second Deposition Testimony Is Not Reliable**

13          The USA urges that Lang's second deposition testimony was

14  against his penal interest and is trustworthy as a result.   I

15  recommend against such a finding for several reasons.

16          First, the Lien Claimants' position is premised on Lang

17  indirectly exposing himself to criminal liability by changing his

18  testimony.   They reason that (1) Lang's second testimony was

19  completely inconsistent with his first testimony, (2) Lang presum-

20  ably must have lied under oath in his first testimony,[3/] (3) and Lang

21  is therefore subject to a perjury prosecution for lying during his

22  first testimony.  However, unlike in the more convincing case where

23  an accomplice's testimony implicates himself and a defendant at

24  trial or other proceeding, Lang never affirmatively admitted to any

25  activity that potentially subjected him to criminal liability.  Cf.

26  United States v. Dozier, 844 F.2d 701, 707 (9th Cir. 1988) ("Mejia

27  _____

28  [3]  I do not accept the notion that Lang's second testimony was the truth simply
    because it was different than his first testimony.  The second testimony just as
    easily could be total fabrication and the first could be truth.

06CV2648

1  said Dozier hired him, housed him and paid him to tend the [mari-

2  juana] garden.  These facts incriminated Mejia at the same time that

3  they spread the blame to Dozier."); <u>Zanazanian v. United States</u>, 729

4  F.2d 624, 627 (9th Cir. 1984) (accomplice's statements about his own

5  participation in narcotics activities); <u>United States v. Myers</u>, 2006

6  U.S. Dist. LEXIS 25245, *9 (D. Haw. Jan. 12, 2006) ("The informant's

7  statement that he or she had previously purchased and consumed

8  cocaine and marijuana was made against the informant's penal

9  interest.").

10      Here, even if true, the scheme Lang describes does not appear

11  criminal in nature, and the USA has not cited any criminal statute

12  this scheme potentially violated.  Rather, by operation of <u>civil</u>

13  statute, such a scheme merely voids the original Note.  Thus, the

14  USA's position is premised entirely on Lang indirectly exposing

15  himself to criminal liability by changing his testimony.  However,

16  the USA's reliance on indirect, abstract exposure to criminal

17  liability is less convincing than when a witness, informant, or co-

18  defendant affirmatively implicates himself in criminal activity.

19      Second, as discussed more fully below, even assuming Lang's

20  second testimony subjected him to criminal liability, he had a

21  rather substantial financial motive to change his original testimony

22  and risk a perjury prosecution.  After all, he stood to gain the

23  benefit of being relieved of substantial non-dischargeable tax

24  obligations to two separate taxing authorities, not to mention a

25  substantial debt to White Memorial.  The possibility that he might

26  risk criminal liability for such a substantial financial benefit

27  weakens the USA's argument for Lang's veracity.[4/]

28
_____

[4]   That being said, although I identify this possible motive, I assign only
nominal weight to it.

Third, Lang staunchly defended his changed testimony and asserted he did not lie at either deposition.  He stated that his first deposition was truthful because he testified to what he believed to be the truth at the time.  (Id. at 34:1-19, 36:2-8, 47:1-9, 48:22-49:9.)  Apparently, Cotto, who Lang claims was his attorney at the time,[5] advised him not to testify that the Note was structured to avoid creditors.  (Id. at 34:8-16, 36:2-8, 68:10-17.) Lang insisted that he was telling the truth and was not deceiving anyone at his first deposition because he was relying on Cotto's advice.  (Id. at 34:12-16, 35:10-13, 36:2-8, 68:14-17.)  He changed his testimony after he supposedly discovered that Cotto's advice was incorrect and was based on Cotto's own self interest.  (Id. at 23:18-20, 35:10-13, 36:5-8.)  Thus, if, as Lang insists, he told the truth at both depositions, he did not perjure himself, he cannot be criminally liable, and none of his statements were against his penal interest.

Finally, as discussed directly below, even assuming arguendo that Lang's testimony somehow exposed him to criminal liability, additional circumstances surrounding Lang's deposition indicate that his second deposition testimony is not trustworthy.

### a.   Attempt to Blackmail Cotto

Lang's testimony is unreliable partly based on events that occurred between his first and second depositions.  Both Lang and Cotto testified that Lang enlisted a friend, James Maddux, to approach Cotto, offer him money, and urge him to transfer control of

---

[5]  I find no evidence on the docket that Cotto has ever represented Lang in this case.  Cotto himself has had retained counsel for some time now.  Cotto denied acting as Lang's attorney in this case or at any point in their relationship. (Id. at 145:12-15.)

1   NPT to Maddux.  (<u>Id.</u> at 44:22-45:14.)   These events essentially

2   amount to an attempt to extort Cotto.

3        As background, just prior to having Maddux contact Cotto,

4   Lang had arranged for the sale of the Lone Jack Road property for

5   $1,150,000, and the transaction had proceeded to escrow.  (<u>Id.</u> at

6   24:10-16.)  The sale proceeds would have satisfied Lang's debt to

7   the IRS, FTB, White Memorial, <u>and</u> would have left several hundred

8   thousand dollars for himself.  (<u>Id.</u> at 24:2-5, 77:1-6.)  However,

9   because NPT's Deed encumbered the property, it had to be cleared for

10  escrow to close.  To clear NPT's lien, Lang presented the reconvey-

11  ance Cotto supposedly signed in 1993 to escrow, but the reconveyance

12  could not be recorded because it had not been notarized.  (<u>Id.</u> at

13  24:20-24.)

14        Without first attempting to contact Cotto himself after

15  nearly 15 years without contact, Lang had Maddux approach Cotto

16  first.[6]  (<u>Id.</u> at 78:4-80:21.)  Lang testified that the purpose of

17  the transfer of control to Maddux was to have Maddux release NPT's

18  lien on the Lone Jack Road property so Lang could close escrow.

19  (<u>Id.</u> at 75:14-17 (Maddux "was supposed to take control of the trust

20  and allow [Lang] to close the sale on the home."); <u>see also</u> <u>id.</u> at

21

22

23  [6]   Lang testified inconsistently on this point.  Early in the hearing, Lang
    testified on direct examination that he had contacted Cotto first to ask him to
24  notarize the reconveyance he had supposedly signed years before, but Cotto
    apparently refused to do so without a $150,000 payment from Lang.  (<u>Id.</u> at 24:17-
    25:7.)  This was the purported basis for Lang's belief that Cotto would not
25  cooperate.  However, when I later questioned Lang, he admitted that he had not
    talked to Cotto for 12 or 15 years and had not contacted Cotto before sending
26  Maddux after him.  (<u>Id.</u> at 78:4-79:17.)  He admitted he simply "assumed" and
    speculated that Cotto would demand more money.  (<u>Id.</u> at 79:8-9.)  When asked why
27  he automatically assumed this, Lang mentioned nothing about his earlier testimony
    that he had actually contacted Cotto, or the $150,000 demand, and skirted my
    repeated questions on this point by simply stating that he would rather deal with
28  Maddux than Cotto.  (<u>Id.</u> at ll. 12-17.)  Lang's inconsistent and evasive testimony
    did not credibly explain why Lang did not contact Cotto before sending Maddux
    after him.

06CV2648

45:11-14, 76:17-77:6.)   According to Cotto, Maddux offered him $75,000 and stated that if Cotto did not cooperate, Cotto "wouldn't get a penny of the money [he] was owed." (<u>Id.</u> at 118:20-24.)   After Cotto refused, Lang himself contacted Cotto and "said if [Cotto] didn't sell the note, that [Cotto] shouldn't expect to recover [on the] loan."[7] (<u>Id.</u> at 144:24-145:2-3.)   These events occurred after Lang's first deposition, when Lang's and Cotto's stories matched, but before Lang's second deposition, when Lang changed his testimony such that the end result would be the satisfaction of the debt he owed to the IRS, FTB, and White Memorial.

Lang's testimony does not support his assertion that a scheme existed to defraud future creditors.   If, as Lang testified, the original plan was for Cotto to cooperate and erase the lien created by the Deed whenever Lang asked, none of Lang's testimony credibly explains his actions afer the first deposition.   Although Lang and Cotto had lost touch for many years, Lang automatically assumed Cotto would not "cooperate" and would demand more money to release NPT's lien on the house. (<u>Id.</u> at 79:3-11, 80:13-17.)   However, it is unclear why Lang automatically assumed Cotto would demand money to transfer the Note or release NPT's lien. (<u>See generally</u> <u>id.</u> at 75:1-80:1 (Court's examination of Lang).)   Although Lang and Cotto had lost touch and had not spoken for years, neither man testified that this was the result of a falling out, fight, or disagreement. By all accounts, they had been close business associates, if not friends, and that relationship had not fallen apart despite the lack of contact.   No reasonable explanation exists for Lang's assumption

---

[7]  This testimony is uncontroverted.  Lang was present in the courtroom during this portion of the hearing.  The USA did not recall Lang to deny Cotto's testimony and Lang himself did not cross-examine Cotto on this conversation.

06CV2648

1    that Cotto would not "cooperate" and would demand money in contra-

2    vention of his supposed promise in 1993 to release the lien when

3    asked.

4           Moreover, having Maddux contact Cotto to pressure him is

5    fully consistent with the Note being a valid loan.  After all, Lang

6    would have known that the original $335,000 loan had been accumulat-

7    ing compound interest at a rate of at least 8% since 1993 and had

8    substantially grown in size.  As a result, Lang would have known

9    that the money he owed on the NPT Note would have consumed all, or

10   nearly all, of the $1,150,000 sale price and would have left him and

11   his creditors with little, if anything.  Lang tellingly admitted

12   that he was "basically out of money" at this time and "had no

13   ability other than the equity in the house to do anything," (id. at

14   79:25-80:1), including paying non-dischargeable tax liabilities.

15   Thus, the only obstacle to Lang's path to freedom from the tax

16   liens, and extra money in his own pocket, was the money he owed on

17   the NPT Note.  To try to remove that obstacle, he employed Maddux to

18   pressure Cotto to transfer control of NPT.  Maddux would then

19   release the valid NPT lien and allow escrow to close.  The testimony

20   certainly supports this scenario, and it is much more plausible than

21   Lang's explanation for sending Maddux after Cotto without ever

22   contacting Cotto himself.

23          The foregoing supports the validity of the Note and Deed and

24   casts doubt on the veracity and reliability of Lang's second

25   deposition testimony.

26                **b.   Deed Recorded Against Cotto's House**

27          Another major factor that weighs against the reliability of

28   Lang's second deposition is Cotto's unopposed testimony about a

1    forged deed of trust that was recorded against Cotto's house shortly
2    after Maddux and Lang contacted him to pressure him.

3        Cotto testified that after Maddux contacted him, Cotto
4    received a strange email that appeared to have been written by Cotto
5    himself.  The purported email from Cotto essentially expressed his
6    supposed fear about what Lang might do and stated that Cotto was
7    going to sign his own house over to Maddux by recording a deed of
8    trust on the property with Maddux as the beneficiary.  (Id. at
9    121:14-122:13.)  This email greatly concerned Cotto, who investi-
10   gated and discovered that a forged deed with Maddux as the benefi-
11   ciary had in fact been recorded against Cotto's house.[8]  (Id. at
12   122:9-13.)  After further investigation, Cotto demanded that Maddux
13   remove the lien, and Maddux complied in short order.  (Id. at
14   128:10-17.)

15       Cotto further testified that Lang then called him a second
16   time and essentially stated that "the next time, it wasn't just
17   going to be [Cotto's] home, that . . . if [Cotto] didn't sell [Lang]
18   the loan, [Cotto] wasn't going to make a penny."  (Id. at 144:7-10.)

19       Cotto's account above is uncontroverted, as the Lien
20   Claimants neither presented counter evidence nor cross-examined
21   Cotto on this testimony.  Moreover, Lang himself was present in the
22   courtroom, heard Cotto level these accusations against him, had the
23   opportunity to cross-examine him, but failed to ask a single
24   question on the subject.  (See id. at 209:8-211:17 (Lang Cross
25   Examination).)  As a result, Cotto's unopposed account casts further
26   doubt on the reliability of Lang's evidentiary hearing and second
27   deposition testimonies.  The above lends strong support to the

28
_____
[8]  The amount of the lien was $335,000, which is the original amount of the Note.
(Id. at ll. 11-12.)

06CV2648

1  conclusion that Lang's first deposition testimony, not the second
2  testimony, is credible.

3  **c.   The Validity of the Reconveyance is Doubtful**

4  Yet another factor that militates against Lang's credibility
5  is the doubtful authenticity of the purported reconveyance he
6  produced late in this case.  While Lang claims Cotto contemporane-
7  ously executed the reconveyance and the Deed, his inconsistent
8  testimony casts serious doubt on whether Cotto ever signed the
9  reconveyance at all.

10  Despite knowing that a reconveyance could not be recorded
11  without first being notarized, Lang failed to have the reconveyance
12  notarized in 1994, when Cotto purportedly signed it.[9]   Lang
13  testified that he required Cotto's signature in 1994 so he "wouldn't
14  have to get [Cotto's] signature in the future," (id. at 22:1-2), but
15  did not require the notarization, the most crucial step, because
16  they "weren't in front of a notary, and [Lang] didn't think it would
17  be required at the time.  [Lang] didn't think it would be an issue
18  later to get it," (id. at 67:13-17).  But if Lang did not think "it
19  would be an issue" to have Cotto notarize the document in the
20  future, would it also not have been an issue to secure Cotto's
21  signature in the future?  If Lang truly wanted to avoid having to
22  secure Cotto's cooperation in the future, he would have had Cotto
23  notarize the reconveyance when he supposedly signed it in 1994.
24  Without notarization, Cotto's signature was meaningless, the
25  document could not be recorded, and Lang would have to ask Cotto for
26  his signature again in the future.  Lang's testimony not only casts

27

28  [9]   At the hearing, Lang admitted that he knew in 1994 that notarization was a prerequisite to record a document like the reconveyance.  (Id. at 38:21-39:7, 39:21-40:2.)

06CV2648

1    serious doubt on the authenticity of the reconveyance, it casts

2    doubt on Lang's credibility in general.

3              d.    **Lang's Strong Financial Motive to Change His Testimony**

5         The final factor that weighs against Lang's credibility is

6    his strong financial motive to change his testimony, as he stood to

7    gain substantially if he changed his testimony and prevailed.

8         If NPT's lien is valid, Lang's creditors will not be paid and

9    he will still owe nearly $700,000, most of which is the most onerous

10   type of debt possible:  unpaid tax liability owed to the California

11   and United States governments.   Moreover, as a result of this

12   action, Lang has already lost his house, and it all would have been

13   for naught if he cannot satisfy these debts with the auction

14   proceeds.  The continuing tax liabilities will be an extremely heavy

15   burden on him into the future--unless, of course, NPT's lien somehow

16   is invalidated.  Lang's motive is more than merely monetary.  The

17   possibility of having oppressive tax burdens erased is a significant

18   psychological motive that provides a possible explanation for his

19   changed and inconsistent testimony.

20        To be sure, Cotto also has a motive to lie.  Assuming that

21   Cotto's testimony is fabricated and he indeed orchestrated a scheme

22   to defraud Lang's future creditors, Cotto would essentially obtain

23   a windfall of several hundred thousand dollars.  However, the

24   possibility that such a motive actually exists here is diminished

25   when one considers that Cotto's story has remained consistent

26   throughout this case and actually matched Lang's version of events

27   before Lang changed his story.  Moreover, unlike with Lang,

28

06CV2648

surrounding circumstances do not discredit Cotto.  Of the two men,
Lang has a more compelling financial motive.

### 3.   Recommended Finding of Fact

Based on the foregoing, I recommend the finding that Lang's
second deposition testimony was not against his penal interest.  I
base this recommendation on Lang's own insistence that he did not
lie in either deposition, the fact that his testimony did not
directly implicate him in any criminal activity, and the circum-
stances surrounding his testimony.  Those circumstances include (1)
Cotto's uncontroverted testimony about Lang and Maddux attempting to
blackmail him through Maddux, (2) Cotto's uncontroverted testimony
that a forged deed was recorded against his house and about Lang's
threats before and after the deed recordation, (3) the doubtful
authenticity of the reconveyance Lang produced after years of
litigation, and (4) Lang's strong motive to change his testimony and
invalidate NPT's lien.

Once the Court discounts Lang's second deposition, the Court
is left with Cotto and Lang's original, matching testimonies on the
authenticity of the Note and Deed.  As a result, because, the valid
Deed was recorded before the Lien Claimants' interests vested, it
gives NPT's lien priority over all other liens asserted in this
case.

### B.   Cotto Provided Credible Explanations

In their attempt to discredit Cotto and invalidate the Note,
the Lien Claimants argue that several purported inconsistencies
support their theory that the NPT Note was in fact a fraudulent
scheme.  On balance, however, Cotto was able to provide reasonable
explanations for the inconsistencies.  Because the Lien Claimants

06CV2648

1  did not present any evidence that could impeach Cotto's credibility,

2  I recommend that (1) Cotto's explanations be found credible, (2) the

3  Lien Claimants' purported inconsistencies do not support the finding

4  that the Note was a scheme to defraud Lang's future creditors, and

5  (3) Cotto's version of the Note be found to be the authentic

6  version.

7      **1.   Cotto's Explanation for Finding Documents At the
         Eleventh Hour**

8

9      Cotto and Lang both provided different executed versions of

10  a loan agreement that each claims is the authentic Note.  The Lien

11  Claimants first argue that the loan agreement Cotto produced is

12  suspect because he produced it after nearly 5 years of litigation

13  and only two weeks before the evidentiary hearing that would

14  determine whether NPT would receive hundreds of thousands of

15  dollars.[10]/  On balance, Cotto's explanation for the late production

16  appears plausible.

17      At the hearing, Cotto explained that he had a "great deal" of

18  difficulty finding the loan agreement despite diligently looking for

19  it.  (Doc. No. 151 at 104:4-22, 185:12-186:8 (detailing Cotto's

20  extensive efforts to find documents), 196:8-197:10 (same).)  He

21  eventually found the loan agreement he produced in a box that was

22  among 200 or so boxes in his basement.  (Id. at 104:23-105:12.)

23  Although the loan agreement was associated with NPT, he found the

24  document in a RETA[11]/ box.  (Id. at 105:9-12.)  Cotto explained that

25

26  [10]   Of course this argument also cuts against the authenticity of the loan
    agreement Lang produced because he produced it in late 2010, approximately four
27  years after litigation commenced.

28  [11]  RETA, or Real Estate Technical Advisors, was the real estate consulting
    business Cotto operated in the early 1990s.  RETA received substantial contracts
    through Lang and Lang's employer, KPMG.

1  these boxes contained archived documents from his various business

2  ventures over the years and were packed by his now-deceased former

3  secretary, who was very familiar with Lang but was not very familiar

4  with NPT.  (Id. at ll. 15-22.)

5       Cotto testified that he began looking through the RETA boxes

6  after I questioned him about his net worth at the settlement

7  conference.  (Id. at 105:2-8, 163:17-25.)  He felt he needed to

8  reconstruct his net worth and began going through his old contracts.

9  (Id. at 105:2-8, 163:17-25.)  He found the NPT loan agreement among

10 the RETA contracts.  Cotto surmised that his secretary saw that the

11 loan agreement involved Lang, associated Lang's name with RETA, and

12 misfiled the loan agreement in a RETA box.  (Id. at 105:15-22.)  As

13 a result, Cotto was unable to find the NPT loan agreement in the NPT

14 boxes, where he originally looked to find the NPT loan agreement.

15 Given that the Lien Claimants presented no reason to believe that

16 Cotto was not being truthful, his explanation for the delayed

17 production of the Note is credible.

18       **2.  Cotto Did Not Form NPT To Defraud Lang's Creditors**

19       White Memorial also argues that "the circumstances surround-

20 ing the loan were suspect" partly because (1) NPT did not transact

21 any business other than the Note, and (2) NPT was created solely for

22 that purpose.  However, Cotto provided uncontroverted testimony that

23 NPT was not created solely for the purpose of being party to the

24 Note.

25       First, Cotto testified that he formed NPT to serve as the

26 broker of record for a large real estate investment fund that Lang

27 was establishing.  (Id. at 94:15-19.)  According to Cotto, Lang's

28 investment fund did not succeed, but it was a "brilliant idea" that

1    had the potential to generate ten to fifteen million dollars in

2    commissions. (See id. at 94:19-25, 95:15-22.) Cotto testified that

3    he initially formed NPT to participate in Lang's investment fund.

4    (Id. at 95:8-9.)

5        Second, Cotto formed NPT to avoid any appearance of conflict

6    of interest.  He did not want RETA named as Lang's broker of record

7    because RETA was actively engaged in business with Lang's employer,

8    KPMG.  (Id. at 95:6-8 ("So [Lang] was still with KPMG, and I was

9    trying to avoid any conflicts.  So I set up a separate entity to do

10   that business with this [real estate investment] fund."); see also

11   id. at 162:17-163:3.)

12       Cotto's testimony stands unopposed, as the Lien Claimants did

13   not present any evidence or testimony to contradict Cotto's

14   testimony that Lang's real estate investment fund existed or that

15   Lang intended to name NPT as a broker of record.  As a result, White

16   Memorial's argument is baseless, as NPT was not established solely

17   for the purpose of being a party to the Note.

18              **3.   Cotto's Failure to Collect Loan Payments**

19       White Memorial also places great weight on the fact that NPT

20   did not collect a single loan payment from Lang and did not seek to

21   foreclose on its security interest in the Lone Jack Road property.

22   Ultimately, while it is curious that Cotto would take such a

23   lackadaisical approach to such an arguably large amount of money,

24   his failure to collect on the loan is not unreasonable given (1) his

25   original purpose in making the loan and (2) the fact that the Deed

26   secured his interest.

27       Cotto testified that he did not pay much attention to the

28   loan because his interest lay in securing more business for RETA

06CV2648

1    from Lang and KPMG.  He testified that Lang broached the subject of

2    the loan on a car ride, during which Lang expressed the desire to

3    purchase a nice house and asked Cotto for the loan.  (Id. at 92:15-

4    93:4.)  Cotto explained that it was understood that if he loaned

5    Lang the money, Lang would steer more business to RETA, and Cotto

6    would benefit as a result.  (Id. at 92:25-93:1, 94:4-6.)  Indeed,

7    RETA received more business and made more than $2 million in

8    commissions after he made the loan.  (Id. at 108:5-21.)  This was

9    Cotto's primary purpose in agreeing to the loan arrangement, and the

10   loan itself was secondary.  (See id. at 94:4-6.)

11        Moreover, Cotto was not worried about the original loan

12   principle because the loan money originated from RETA,[12] and the

13   more than $2 million in commissions RETA earned as a result of the

14   increased business more than covered the loan principal.  (Id. at

15   108:5-9.)

16        Cotto also was not worried about collecting on the loan

17   because it was accruing compound interest at a high rate and it was

18   all secured by the Deed.  (Id. at 106:22-107:14, 115:18-116:1,

19   116:14-18.)  Cotto explained that the real estate market was strong

20   and he believed that the appreciation on the Lone Jack Road property

21   would cover the principal and interest.  (Id. at 115:18-116:1.)

22        Cotto's unopposed testimony establishes that the loan itself

23   was not of great interest to him when he made it, Cotto's stated

24   purpose for the loan was fulfilled when RETA received more business,

25   and Cotto was not worried about losing the principal or interest

26   because the Deed protected both.  Indeed, NPT's very existence in

_____

28   [12]  As Cotto explained, as the head of both RETA and NPT, Cotto simply transferred
     the money from RETA to NPT, and NPT in turn loaned the money to Lang.  (Id. at
     103:2-8, 165:21-166:1.)

06CV2648

1  this litigation validates Cotto's confidence that the Deed would

2  protect his interest.  Ultimately, I do not place much weight on the

3  fact that Cotto did not collect any loan payments or attempt to

4  foreclose.

### IV.  CONCLUSION

6      Based on the foregoing, I recommend that the Court find that

7  Lang's testimony regarding Cotto's supposed scheme to defraud Lang's

8  future creditors is not credible.  I further recommend that Cotto's

9  testimony be found credible.  As a result, I recommend that the

10  Court find that NPT's Note and Deed are valid, enforceable instru-

11  ments that encumbered, and created an enforceable security interest

12  in, the Lone Jack Road property.  As a result, I ultimately

13  recommend that the funds in the Court's registry first be used to

14  satisfy the outstanding debt due NPT.

15      IT IS ORDERED that no later than November 21, 2011, any party

16  to this action may file written objections with the Court and serve

17  a copy on all parties.  The document should be captioned "Objections

18  to Report and Recommendation."

19      IT IS FURTHER ORDERED that any reply to the objections shall

20  be filed with the Court and served on all parties no later than

21  December 12, 2011.  The parties are advised that failure to file

22  objections within the specified time may waive the right to raise

23  those objections on appeal of the Court's order.  Martinez v. Ylst,

24  951 F.2d 1153, 1156 (9th Cir. 1991).

25  DATED:  November 7, 2011

26

27  _____

28                                 Hon. William V. Gallo
                                   U.S. Magistrate Judge

06CV2648